Recvd 1/11/22 SG

# NOTICE OF FILING OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT



## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    Plaintiff,

Docket No.: 0207 1:21CR00089-001(SJ)

v.

Judge: The Honorable Sterling Johnson, Jr.

ELIJAH SONG,

    Defendant.

## NOTICE OF FILING

Defendant Elijah Song, respectfully requests that the attached Defendant's Statement of Material and Factual Inaccuracies and Omissions to the Probation Office, setting forth his objections to the presentence investigation report, be filed with the Court and made a part of the record in this case.

Respectfully Submitted,
ELIJAH SONG

Dated: January 3,

FROM: 92417053
TO: Whang, Elizabeth; Zissou, Steve
SUBJECT: Presentence Investigation Report Objections
DATE: 12/15/2021 02:09:06 PM

Objections to the PSR

1. pg 1, "Arrest Date: August 5, 2020" is incorrect, as the arrest date is AUGUST 3, 2020

2. pg 2, "Legal Address and Residence Address: Undomiciled" is incorrect. Correction:
    40-02 149th St. 3rd Fl
    Flushing, NY 11354
I will be residing with my mother, Jung Hyang Song after my release, and she has granted me approval.

3. pg 4, Section "9": "The DOT has not provided information to the Government or case agents related to the monetary loss associated with damage caused to the traffic enforcement cameras from the arson spree." And, on page 6, "17.", "Per the Government, this figure is based on a preliminary loss estimate calculated by the New York City DOT in relation to the cost of repairing the traffic enforcement cameras (17 total) set on fire by the defendant. The Affidavit of Loss form has not been returned as of this disclosure, and the specific loss amount incurred by the DOT remains unknown."
Correction: What is the exact restitution amount, as it is not substantiated by an actual verifiable monetary amount by the DOT, but is instead only an estimation. The restitution may be a smaller amount, and therefore the actual amount should be made the restitution.

4. pg 5, "12.", The spiral notebook, (document ES000080-ES000137) had about 54 pages of content in it. On page 21, the following is stated: "If it was not for you, us, I would love to give all of my savings to my mom. Join the military: learn everything I can about gun, explosives, hand to hand combat, and knife defense. As soon as I am out, I would love to be a catalyst for these ... to take back their country from these ancient evil devil worshippers." The notebook also included in the other 53 pages, information on stock research, daily planning, motorcycle parts and repairs, and a continuing pharmacy education calendar.

5. pg 5, "12.", the "stacks of anti-Semitic propaganda fliers" was just one stack of no more than 15 copies of the same flier, which can be clearly seen on discovery item ES000154-ES000174, specifically on page 17/21 of the PDF document.

6. pg 6, "15.", The arrest date was August 3, 2020, not August 5, 2020. In brief post-arrest statements, there was absolutely no admission in the involvement in committing arson to the five DOT traffic enforcement cameras. All that was mentioned was a request to speak to counsel and the signing of Miranda rights. See document, ES000001-ES000001, on which is a notation stating "Asked to speak to attorney."

7. pg 6, "16.", "With respect to the seized firearms parts and ammunition from the defendant's vehicle and the above-noted residences", is incorrect as there were no firearms parts or any ammunition found from the vehicle. Refer to documents: ES000138-ES000140, ES000148-ES000153, ES000141-ES000147, as well as photographs of the Toyota Camry and items found, ES000154-ES000174.

8. pg 6, "16.", During the fires set late at night on public streets during the height of the Covid-19 pandemic, the streets were clear of any passersby, and specifically done so at that time to avoid any "substantial risk of death or serious bodily injury to any person." Specifically, the fires were lit when there were no people and the areas were closely monitored to steer any passersby away while the fires were lit. The fires, all "set using the same method mentioned above" were done so by setting a fire "at the base of the camera pole, in the electrical junction box", and specifically in the box, so as to avoid any spread, and to contain and concentrate the fire on the wires of the electrical junction box. No gasoline/accelerant was spread anywhere else, but inside the box, and on the wires. There was no way for any debris or glass to fly anywhere as only the wires were burning. Some boxes had a flap to fully enclose the box, and so the flaps if present were closed to again contain the flames. The camera poles were far enough away from dwellings to ensure no one could be hurt. The intentions were the camera wires alone. It could not have been known that setting afire to the wires inside of the electrical junction box could have been certain to harm any person. Often, I have witnessed firefighters responding to the scene of the fires, and by the time they came, the fire was nearly out, as there was mostly smoke, and have seen the firefighters quickly and easily extinguish the fire.

9. pg 7, "23.", According to the Plea Agreement, the Office estimated that "the likely adjusted offense level under the Guidelines to be 20", not 24. The risk of substantial death or serious bodily injury was not knowingly created. Therefore the base offense level should be 20. In USA v. Timothy J. Seagroves, 107F. 3d5, 1997 U.S. App. Lexis 7027, "the word 'knowingly' plainly applies

to the creation of the risk, not to any certainty that the harm would come to pass." Additionally, in USA v. Santo Ruiz, 105F.3d 1492; 1997 U.S. App Lexis 2300, Feb 12, 1997, "Because we remand this case for findings and resentencing, we think it necessary to clarify further the definition of 'knowingly' appearing in subsection (a)(1), but not (a)(2), of the arson guidelines. See U.S.S.G. Subsection 2k1.4. The guideline's structure 'clearly suggests that there must be a meaningful distinction between the two sections.' DiSanto, 86 F.3d at 1256. As we noted in DiSanto, 86 F.3d at 1257, the Ninth and Eleventh Circuits have adopted the Model Penal Code's definition of 'knowingly'. In those circuits, 'a defendant can be found to have 'knowingly' created a substantial risk of death or serious bodily injury under subsection 2k1.4 only if the defendant was aware that a substantial risk of death or serious bodily injury was practically certain to result from the criminal act.' Karlic, 997 F.2d at 569 (emphasis added); accord Honeycutt, 8F.3d at 787; see also Model Penal Code Subsection 202(2)(b) (1985)."

10. pg 11, "71.", I did not curse at my mother "on a routine basis". That is a fabrication. It did happen but not for a prolonged period of my life, perhaps a few years in my teenage years and only a handful of times.

11. pg 11, "71.", The name of the boyfriend at the time was Steven Choi. I "hated that guy for a very long time" in my childhood through my early teenage years, but I eventually forgave him in my heart, and I have no animosity towards him.

12. pg 11, "71", I did not receive "a great deal of emotional torment over being teased at school" any more than the typical school yard teasings could inflict. None of the teasings affected my life, and I merely took it as a part of growing up.

13. pg 12, "71.", I have never felt like an outcast in my own home. My mother and brother loved me. Things were difficult but I at least knew I was loved and felt belonged, as proven by our continued relationship while I am incarcerated.

14. pg 12, "71.", My family never lived in Manhattan. I was only born there, at St. Vincent's hospital. We had been living in Queens.

15. pg 12, "73.", I will be residing with my mother upon release at her home address:
    40-02 149th St. 3rd Floor
    Flushing, NY 11354

16. pg 12, "76.", I have also worked in the kitchen, preparing meals for the general population of the MDC, as a cook since May 18th, 2021. I have continued to work there since.

16. pg 13, "80.", To clarify the situation I had with that inmate, he said those things while he was clearly high or in an altered state of mind. He was known to abuse drugs. He later apologized and I never had any issues with him. I had no reason to report it, since I weighed that he was essentially high. I do not fear for my safety while in general population. No one has ever threatened me and I have had no real issues with any inmate.

17. pg 14, "83.", My NYS Pharmacist license number is 063215. My mother has sent in a copy of my St. John's University Doctor of Pharmacy diploma, which I have submitted to the Education Department for records.

17. pg 14, "85.", August 3, 2020 was the arrest date.

18. pg 15, "88.", "GAF" Pharmacy, not GAP Pharmacy.

The most important objection I have is regards to points 8 and 9, as I object to the base count of 24, and believe it should be 20. I have substantiated by claims with legal cases.

TRULINCS 92417053 - SONG, ELIJAH - Unit: BRO-K-C

---

FROM: Zissou, Steve
TO: 92417053
SUBJECT: RE: Too many Characters
DATE: 12/23/2021 02:06:05 PM

The 14 day rule is a soft timeframe. No reason to worry about timing. Wenzel is involved because when objections are made by the defense, the burden of proof is on the government. This means that the government must prove whatever factual issue is in dispute. The burden is knows as by a "fair preponderance of the evidence." Contrast this to the burden of proof at trial, which is "beyond a reasonable doubt." In other words, preponderance of the evidence is a lesser standard of proof. It is sometimes called "more likely than not."

Since the government has the burden of proof, the next step it to see if there are areas of agreement, if so, these objections are resolved in the defendant's favor. Most of your factual objections (i.e. names, dates, addresses, etc.) are easily resolved.

Then there are legal objections. The only one that matters in your case is the applicable advisory sentence range. It involves a legal analysis. Wenzel's position is hardly surprising: "I agree with probation, but I am going to stand by the plea agreement and recommend 60 months." As far as we are concerned, this is good enough. With a joint recommendation from the government and the defense, it would be shocking if Judge Johnson did not go along. But yes, it is a wee bit nerve racking. That is federal court. You never know until the fat lady signs.

Regarding designation, the process is also straightforward but unpredictable. At sentencing, we will ask the judge to "recommend a designation to the North East Region (or to a specific facility)." The judge will agree, and then the final designation is made by the BOP. 80% f the time the BOP adopts the judge's recommendation. But 80% is not 100%. However, there is a provision in the FSA/Cares act legislation that mandates folks not be designated more than 300 miles from family.

Regarding restitution, looking at the plea agreement again to be certain. The last sentence of paragraph 2 states that "The defendant stipulates that the restitution amount will not be less than $137,000." We agreed to this "not less than" amount. Do you want to stand by the agreement? As Wenzel has agreed regarding your sentence? Regardless, I will ask for the underlying loss docs. But is this really the hill you want to die on? How much less do you think it will be? And may well be even more if the government has to prove every dollar. Do you really want judge Johnson to hear about how costly your crimes were, when what we really need is 60 months? Do you really want to risk Judge Johnson questioning your acceptance of responsibilty by challenging something we already agreed to? These and others are the considerations a lawyer and client must assess before filing objections of any kind. Not easy by any means. Don't confuse my prudence with indifference. ALL objections=important. But the more important question is the risk that one takes by making them. Understood?

ELIJAH SONG on 12/23/2021 7:19:18 AM wrote
by phone alone, or video as well? I understand not going to the court, but what about video? Would they also need to contact trace for a video call?

Why would AUSA Wenzel have anything to do with the correcting of the errors of the PSR when that is the duty of the probation officer? Again, have you sent the objections or not? I've been asking you multiple times now. And after this meeting, will you send them or not. I am being guided by the rules that state we have 14 days. If you haven't, do so immediately. And I will also insist that I had a full 7 days to go over my final PSR.

The objections, some of which may seem insignificant to you, include obvious errors in spelling of names or details, are worth mentioning, for example, a missing address on the second page, as I don't want to end up in a prison 500 miles away from New York. Some of them will surely be easier to resolve than others, esp as you go towards the bottom of the list. If uncorrected errors still do appear on the final PSR, we will have some unresolved errors that the Judge will have to ultimately resolve during sentencing; thus I still prefer to do it via video, which you said that would be the most likely venue months ago, and when you said that going to court wasn't going to be necessary. Some insignificant errors are still signicant to me, such as the address, sentencing range, the inaccurate estimation of the restitution, and the 22 or so issues I brought up.

Also, it seems as you are guaranting the 60 months, when the PSR recommends 60-71 months, and even when you state that the statue can hypothetically go up to 20 years. Until there is a 100% certainty that I will get the 60 months, every objection to me is important and worth resolving. The sake of resolving objections to the PSR is not only because of the sentencing, but also to ensure that there are no errors on the PSR itself. Certain items are not important to you, but are very important to me.

There was a 14 day window, and I just didn't know what was going on, especially since I didn't get a reply as to what was going on for 4 days.

-----Zissou, Steve on 12/22/2021 9:51 PM wrote:

>

A couple of things have come up. The first is that the attorney for the government has said that he intends to stand by the agreement and recommend a sentence of 60 months. The practical effect of this is that if both the defense and the prosecution recommend the same sentence, it is EXTREMELY unlikely that Judge Johnson will impose a longer sentence. I have a meeting schedule with AUSA Wenzel tomorrow (Thursday) morning to resolve the range and other errors and omissions in the PSR.

The second thing that has come up is that the judge issued an order directing that the sentencing hearing be conducted by PHONE. I suspect that this is due to Omicron. Lots of positive breakthrough infections among court employees and contract tracing has been resumed in the courthouse.

This raises several issues. The first is that, as I have explained, you have a right to be physically present for the sentencing hearing. The second is the more important question - is it better or worse to be present in the courthouse? This question can only be answered if you identify the most critical goal. If the primary goal is to get 60 months, it seems to me that it is better to be on the phone. This will make it likely that he will simply go ahead and impose the mandatory minimum.

On the other hand, if you think that some objections are more important than getting the mandatory minimum, then it would be better to be in the courthouse. Complicated questions, to be sure. Bottom line? These are just guesses. Educated guesses, to be sure, but guesses nonetheless.

Another factor is exactly which objections the government will fight and which not. I will have a better idea after I speak with Andrew in the morning.

Moreover, as you will recall, your appeal waiver is triggered at 60 months "OR LESS." Which means that a sentence of MORE than 60 months restores your right to appeal. This is hardly insignificant, since Judge Johnson is reversed by the higher court more often than others. In practical terms, it means taking some risks with objection may be more palatable.

That said, I have not identified a single error/omission that would justify risking a sentence of +60 months. Once again, it is about prioritizing.

You should also know that factual and legal objections to the PSR are common. But sometimes take time to resolve.

Regarding the timing of whatever actual objections we file, no, you can't send them yourself since you have a lawyer. You can draft and "send" them, but they will be rejected since only the lawyer can file legal documents. If you prefer to represent yourself, I will ask the judge to hold a hearing to see if you are competent to do so. If a person is represented by a lawyer, the lawyer files the objections in his/her name on behalf of the client. Accordingly, it is the lawyer who decides which objections should be filed and which should not (FYI, lawyers are not permitted to filed legal papers that are frivolous). If the client disagrees, his/her remedy is to get a new lawyer if the client can afford to do so and if not, ask the court to appoint counsel.

Finally, as I am sure you know, you are not my only client. When I am ready and able to draft and file objections, I will do so. Writing to me that "otherwise, I have to send my objections directly to the Eastern District" will not alter the timeline.

-Z

ELIJAH SONG on 12/22/2021 12:22:26 PM wrote
I need you to reply in a timely fashion as to what is going on with the objections, otherwise, I have to send my objections directly to the Eastern District.
-----Zissou, Steve on 12/18/2021 10:51 PM wrote:

>

Lots to unpack here but let me address one. It is ALWAYS my preference to resolve objection in one proceeding and then have the sentence hearing post. Sometimes the judges agree to handle them this way and sometimes not. Bottom line? The JUDGE decides how and when objections are resolved. Lifetime appointments and black robes give them the discretion to do so. That is just the way it is.

Will reply to the other issues with dispatch, Z.

ELIJAH SONG on 12/18/2021 8:23:19 PM wrote
1) I believe it would be more to our advantage to deal with as many, resolvable objections as possible before sentencing, while there is still time, at that. That way by sentencing, there will be only time to deal with the unresolved issues that are in the addendum, which ultimately the Court will make a ruling on (Federal Rules of Criminal Procedure Rule 32). And again, I received the PSR on 12/14/21, and that can be corroborated via the signature log at the Unit Team office; also again, that is definitely less than the minimum of the 35 days.

2) Yes, exactly my point even since the Plea Agreement phase, as well as dealing with the 21, or 22 total other objections I have found.

3) Right, which is why you were saying Feburary or March. And I also asked you, by how much does a rescheduled sentencing date, usually get pushed back by? Do we request an arbitrary time period e.g. February or March, or does the Judge in his opinion say for example 6 weeks, etc depending on the issues at hand e.g. numerous objections?

4) So what exactly is going on now with the objections? Are you going through them and editing the language? Have you already sent them? And are you going to take any objections out? We have only 14 days, or until the 28th.

5) Also, an issue that never sat well with me, as the issue of counts TWO and THREE. I mentioned to you, earlier this past year, during a video call, when you informed me about the indictment. I raised an issue with the counts because how could the NYC DOT logistically and logically, place 2 cameras within the same block vicinity? Count TWO has a "traffic enforcement camera located at 144-54 Sanford Avenue in Queens, New York", and Count THREE has a traffic enforcement camera located at "144-60 Sanford Avenue in Queens, New York". You had opened up Google maps, and I specifically recall you telling me that you would look into it, but you never got back to me about that. By the time the Plea Agreement came up, you seemed to mitigate that issue, and just wanted me to sign that imminently, saying that due to the mandatory minimum, that issue really wouldn't matter. Yet, in the PSR, the count still stacks up, thus giving me a longer guidelines range e.g. "60 to 71 months" (PSR pg 17, "98."), and since nothing can without a reason beyond a doubt guarantee that I will get the 60 months, that is also something I am objecting to. I am arguing that, on Sanford Avenue, only Count TWO is correct, as Fire Marshall in the FDNY Photo log Sheet writes "144-54 Sanford", in discovery item: ES055501-ES055512. No camera exisits on 144-60 Sanford Avenue, for Count THREE.
-----Zissou, Steve on 12/17/2021 11:06 PM wrote:

>

Too many characters, so I was unable to reply withing the same message you sent. Here are your questions and my answers:

1) How long do you think it will take for the probation officer to review those objections and then send a final PSR?

ANS: the statutory time frame is soft. So do focus on them. Most important is we get them right, not how long it takes. Regardless, objection are (almost) always resolved at the sentencing hearing, whenever that takes place.

2) There are only about 21 days left till sentencing, and I really want her to get the exact number for the damages I owe in restitutions.

ANS: see above regarding time frame.

3) Do you think, also, that 1/6/21 may be possible?

ANS: "Possible" YES, likely NO. You rush, you lose.

ELIJAH SONG (92417-053)
Metropolitan Detention Center (Unit K83)
P.O. Box 329002
Brooklyn, NY 11232

Attn: Docke
Theodore R
225 Cadman
Brooklyn, NY





t No.: 0207 1.21CR00089-001 (SJ)

oosevelt United States Courthouse

Plaza East, Room 118S

11201-1818