February 4, 2022

**BY ECF**

Honorable Sterling Johnson, Jr.
United States District Judge
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Elijah Song,* Criminal Docket No. 21-89 (SJ)

Dear Judge Johnson:

This letter is submitted on behalf of Elijah Song in anticipation of his sentencing, currently scheduled for February 9, 2022.

### I.     The Plea Agreement

Pursuant to a plea agreement with the government, on September 1, 2021, Mr. Song pled guilty to Count five of a five-count indictment charging arson. In the plea agreement, the parties stipulated that the total offense level for the offense of conviction is 17 and that the total adjusted offense level is 17. **This level carries a range of imprisonment of 24 - 30 months** since the defendant falls within Criminal History Category I. However, because the statutory minimum penalty is 60 months, the effective range of imprisonment is 60 months. Moreover, pursuant to the agreement, the parties have agreed to recommend a sentence of 60 months in custody and that the Court should order restitution of $89,262.58.

Despite the estimated advisory sentencing guidelines included in the plea agreement, the government now claims that the appropriate total offense level, after acceptance of responsibility, is 21, resulting in a Guideline Range of 37- 46 months incarceration. Since the parties continue to recommend a sentence of 60 months jointly, this may seem like a distinction without a difference. And it is, for everyone except Mr. Song. It is materially different for Mr. Song because the BOP often makes designation decisions based upon the total offense level. A higher offense level may well result in a higher BOP risk classification. A higher risk classification means Mr. Song may end up in a penitentiary instead of a low or a medium prison. Given the conditions of confinement at the MDC, this is hardly an insignificant concern. Accordingly, we respectfully ask the Court to adopt the advisory range outlined in the plea agreement – level 17, sentencing range 24 – 30 months.

## II.     Personal Background, Education, and Family

Elijah Song is now 29 years old. He has resided in Queens County for his entire life before his detention at the MDC. He has a small but closely knit and supportive family, most of whom live in Queens. Moreover, he has strong community support as well. The details of his early life are, for the most part, accurately described in the presentence report ("PSR"). Perhaps the most relevant detail is that his father, Dong Yun Song, was murdered when Elijah was a toddler. The family is reluctant to discuss this tragedy, but it has left a hole in Elijah's life. As a young, he also witnessed his mother being abused by her former boyfriend and often tried to defend her. He was also a somewhat rebellious child and would, on occasion, but not "routinely" as written in the PSR, use disrespectful language toward his mother and was often subject to racial prejudice as a student.

Mr. Song overcame some of the traumatic events in his young life. Perhaps most importantly, he became a licensed pharmacist upon graduation from St. Johns University in INSERT. Furthermore, when he discovered irregularities at one of the pharmacies he was employed, he immediately contacted NYS Medicaid fraud investigators and reported his suspicions. Mr. Song hopes to resume his career when he is released from custody.

## III.     Mr. Song's Commitment to His Friends and Family Epitomizes the Character Traits Most Often Used to Describe Him: "respectful, thoughtful, honest, loyal."

Elijah Song's life is not defined by the brief period during the forced isolation necessitated by the pandemic that led him to set fire to several speed cameras in Queens County. It has become all too common during the last several years that ordinary law-abiding people suddenly do things that are completely out of character. This sudden loss of balance is what happened to Elijah Song. If you asked him now why he decided to do the things he is accused of doing, as counsel has, his responses suggest that he is not even sure himself. And he is grateful that no one was hurt as it was never his intention that anyone would be injured. Indeed, when the fires were set, Elijah ensured that nobody would get hurt. The real Elijah Song is the young man that defended his mother from an abusive boyfriend. He is the professional that promptly reported wrongdoing by his employer. And the man that his friends adore.

In the pages that follow, people who have lived alongside Elijah share with the Court the family man with a heart of gold eager to support his family through difficult times; the friend who answers the call for help when you are facing life challenges or health crises; and the man who has struggled with personal demons and clearly used bad judgment that led to his arrest and prosecution in this case. As explained in letters from family, friends, and colleagues, each aspect of Elijah's life and character fits together with a different piece of the complex puzzle that is Elijah Song.

For example, Elizabeth Whang, Elijah Song's fiancé, describes in detail the man she hopes to marry one day and reminds us of all of the tremendous toll that the pandemic has taken on health care workers:

I am writing on his behalf to ask for leniency on his trial. Like Elijah, I was born and raised here in Queens. I've been a nurse for almost 6 years at NYU Langone in Manhattan. During the height of the pandemic, there was a shortage of ICU nurses. Due to some past experience in the transplant ICU, I was reassigned to the COVID ICU for three months until travel nurses from different parts of our country were able to alleviate the load. I just graduated from a Master's program for my Family Nurse practitioner degree this May 2021. I've been working towards this degree for the past 3 years while working and going to school part time. A big part of how I was able to get through those years is due to Elijah's unconditional support. I hope to become a primary care NP in a doctor's office in the near future.

I met Elijah back in December 2016 when I was 26 and Elijah was 24 years old at a church in Flushing. Elijah was still in pharmacy school at the time and I thought he was too young for me. But when I met him again when he was 26, I knew I would be a fool to let such a good man go. We've been together ever since. We got engaged in February of 2020. He stayed by my side throughout the pandemic while I was isolating myself in a small unit upstairs in my parents' home.

I was taking all necessary precautions as I had been reassigned to the COVID ICU and I was afraid that I would accidentally pass the virus to my parents. Things were pretty bad in this part of Queens by Elmhurst Hospital. A lot of people in this community got sick and died and there were hardly any people outside. However, as August rolled around, we began to see some hope as businesses were opening. However, Elijah was arrested on August 3, 2020. I have been waiting for his release since last year. Due to COVID-19 visitor restrictions at MDC, I had to wait until June 24, 2021 to see him for a one hour visit, eleven months after his arrest.

The reason why I am able to wait for Elijah is because of his outstanding character, loyalty, and the love he has given me. He was always by my side. I have no obligation to stay with him. I have no children with him, I am not married to him, and I do not have any financial issues that would tie me to him. Throughout our relationship, I was working full time as an RN while also getting my Master's degree at NYU. So I always had somewhere to be. Even though Elijah also had work and was taking care of his widowed mother, he always made it a priority to pick me up or drop me off at work, school, and clinicals. When I was exhausted after a 12.5 hour night shift or a day of classes, I saw him waiting for me and I felt very cared for.

Another thing I love about Elijah is that he is a very positive person and he is always in good spirits. I don't think I have ever heard him complain or grumble about anything. My dog needed cataract and retinal reattachment surgery. This required many pre and post op visits to a veterinary eye doctor in Long Island. Elijah has taken my dog to these appointments many times when I was busy at work or school and he never complained. If it were not for Elijah's help and emotional support, I probably would not have been able to get through graduate school.

Another thing I love about Elijah is his resilience. He studied his entire life toward his 6 year doctoral degree in pharmacy. Elijah's father passed away when he was 2 years old so he did not have the same capital or support that most children have growing up. And yet, Elijah made the most out of his life. His mother and younger brother have relied on him since he was a young man. And despite the trials in his life, I am amazed at how much he loves life. Other things I find attractive about Elijah: his commitment to eating healthy, exercising, and just becoming a better person every day.

Your Honor, please do recall what healthcare workers had to endure in 2020. While most people were able to work remotely from home, healthcare workers were in the front lines reusing PPE without hazard pay or unemployment benefits. Please remember the trauma and stress that healthcare workers had to go through during the pandemic before vaccines were available. Many healthcare workers, including Elijah had to live in isolation. This led to the unraveling of the mental health of many in the medical field.

Please take into consideration the difficult conditions at MDC Brooklyn and the lockdowns that kept inmates in their cells for almost 23 hours a day for days and sometimes even weeks. Please see the ways that Elijah has been working hard at the kitchen unit in MDC Brooklyn. And finally, please remember the way he has contributed to the diverse Queens community as a pharmacist and taxpaying citizen.

Now that I have seen what Elijah needs, I commit to being less self-absorbed with my career and being more attentive of Elijah. I will prioritize getting him whatever counseling, extracurricular activities, and exercise he needs to stay focused on the good things in life. I pray every day for his release. I hope to get married to him and to start our new lives together.

Another health care worker, registered nurse Justin Yi, has known Elijah Song since both were in elementary school:

I am a Registered Nurse at Elmhurst hospital and an Air Force Veteran. I've come to know Elijah from a young age when we attended church together. We were both

in elementary school when we became friends and that friendship continued until now. A little about Elijah's character is that he was always known to be respectful, thoughtful, honest, and someone you can trust.

Growing up I would sometimes not have enough money to buy food and I remember Elijah always sharing or even buying me meals. Another fun memory is our first sleepover where he would give up his bed and sleep on the floor so I wouldn't have too. In high school he was a great student and made a goal to become a pharmacist in order to help those around him. When he eventually graduated from St. Johns and became a pharmacist he continued to help me and my wife. During the start of the pandemic my wife got extremely ill and Elijah would come deliver her medications to my house when I couldn't pick them up.

He has always been selfless. Another example is when I first bought my car and knew nothing about what to look out for. Elijah came with me and told me what to look out for, even taking me to the OMV and helping me with the buying process.

These are just a few examples of the kind of person he is. I don't know what the future holds for Elijah, but I write this letter to shed some light into the Elijah that I know. Him being incarcerated is a disservice to society because of the good I know he offers and a waste of an outstanding citizen. I know given a second chance he can make this world a better place.

Jen Whang met Elijah while both worshipped at the Korean-American Presbyterian Church of Queens. She is a teacher and was a deacon of the church. She had this to say about him:

To begin briefly, the nature of my relationship with Elijah Song is from church. We both attend the Korean-American Presbyterian Church of Queens, NY. I have been attending this church for the past forty-five years and I also serve as a deacon since 2006. I am also a NYS teacher with over sixteen years experience currently teaching at a middle school in a Rockland Country school district.

I know his family and served with his mother at various church functions and missions and met Elijah when he began attending the English Ministry (QPEM) as a college student over ten years ago. He was quiet, reserved, and respectful back then and still is. He served as a Sunday School teacher for the preschool and high school levels, volunteered for church bazaars, and local outreach missions to connect with patients and residents at the Franklin Nursing Home and seniors at the Sanford Home both in Flushing, Queens.

Our friendship deepened when Elijah signed up for our church's 57th Fall Semester Evangelism Training Class in 2018. I was the lead trainer for the class and I was immediately moved by his commitment, passion, and heart to share his testimony and love for Jesus with others, especially his close friends. I was also impressed by his knowledge and understanding of the Bible and theology. During this semester, I had the privilege of getting to know him better and training him to share his faith with others. Despite his busy work schedule as a pharmacist, his commitment to the weekly classes left an indelible mark in me as someone who is trustworthy and reliable.

Elijah Song never disclosed in full detail but on a personal level, I do know from impromptu conversations we shared that he had to overcome academic and cultural challenges to successfully graduate from St. John's Pharm-D program, especially without the presence or guidance of a male parental figure in his house. Culturally, as a Korean firstborn son and elder brother, much onus is laid on them, but Elijah Song proved his ability, tenacity, and perseverance by completing this formidable and honorable program and graduating.

It is difficult for me to comprehend what led to this crime but I know last year was deeply and especially challenging for many people. My sincerest wish is that this letter presents a different and positive light to who Elijah Song really is and that he is more than the sum of his action. It is also my humble request that this letter will serve as a beneficial and contributing factor when the court considers this matter.

Other letters attached to this memorandum express similar views of Mr. Song's character.

Mr. Song's positive character traits went with him into the MDC after his arrest in this case. While there, he worked in the kitchen and tried to help other inmates who did not have his education and computer skills. Mr. Song's kindness so moved inmate Keyshawn Robinson he wrote about it in his letter to the Court:

 I have been incarcerated in MDC for over a year. I have experienced so much within this time. When I first appeared into prison my head was off my shoulders. I didn't have any guidance as a young man. I took one day at a time. While I was sitting here in a struggle and needed help nobody really cared.

One day I was having trouble typing a letter, Elijah, was right there to ask and help me. When he said it, he was nervous but real humble and respectful. I was so arrogant and told him no. When in reality I did need the help. Weeks went by and

we spoke. He ended up being the person who taught me how to type and get my skills where they are today. I am happy to say everything he has taught and shown was genuine. I also see that he didn't judge me nor did he discriminate. I appreciate that about him. I did not come into prison with the intention to have friends, but someone who is there to help with a good personality that would like to see you do good in life, is good company to keep. Elijah has also helped me write a letter to my judge and how it should be. My grammar and spelling has gotten better from what he was taught. I would like to say that he is not a bad person and I see the good in his heart as well as him doing better in the community.

One day I seen Elijah get into an altercation with someone, but the way he handled it was so respectful, calm patient and good energy. In the situation he was in, anybody else would had fought and took things to another level. From that day it taught me how to humble myself and accomplish my goals. I did not know as much knowledge or computer skills. But getting the help from Elijah and watching his steps has shown me how to type and fix my grammar errors. I just hope he can get leniency at sentencing from the heart and know he is not a bad person.

Moreover, as his MDC work assignment evaluation demonstrates, Mr. Song did not let being in jail affect his strong work ethic:

Inmate Song has been working in the kitchen for the past seven months. During this period, he has proven to be responsible, reliable, and very hard working. He takes initiative and responds well to constructive criticism. He is always willing to learn and has become one of the go-to inmates in the kitchen because he pretty much helps with any detail in need. Inmate Song gets along and works great with other inmates and staff.

(See attachments hereto)

## Conditions of Confinement

Elijah Song has been in continuous custody at the Metropolitan Detention Center in Brooklyn, New York ("MDC") since August 3, 2020. While at the MDC, he has endured blackouts, solitary confinement, quarantine after quarantine, assaults, and substandard medical care. Family visits were suspended for months at a time. He has enjoyed little or no sunshine and no programs that might enhance or improve his ability to cope with life once he is released.

However well-intentioned the measures, the conditions exacted an immeasurable toll on Mr. Song and many other inmates. Mr. Song was "locked down" for most of the past 18 months,

almost 24 hours per day. At times inmates were allowed out of their cells for an hour, at other times for an hour and a half or two hours, and other times not for more than 30 minutes if permitted out at all. Normal food service was interrupted and could not be supplemented by commissary, likewise curtailed. Days would go by, multiple times over a week, where inmates were deprived of basic sanitary conditions such as a shower or cleaning supplies for their cells – this despite COVID-19 raging alarmingly through the jails and at one point feces backing up and floating through the cells due to massive flooding.

Judges in the Eastern and Southern Districts of New York have been unsparing in their criticism of the conditions. One judge described the conditions at the MCC and MDC during the pandemic as "inhumane, cruel and harsh, and unreasonably unjust." Transcript, dated, April 29, 2021, at 11, *United States v. Days*, 19 Cr. 619 (CM) (SDNY) and that the "inhumane conditions" at the MCC and MDC are "conditions that should not exist at any incarcerative facility in the United States of America," harshly condemning the MCC and MDC as "prisons of which this country should be massively ashamed." Transcript, dated May 5, 2021, at 12, 16, *United States v. Nunez*, 19 Cr. 691 (CM) (SDNY).

Indeed, Southern District Judge J. Paul Oetken ruled that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been." Id. at 17-18. Judges have begun routinely taking into consideration these "inhumane conditions" when imposing sentence. See *United States v. Nunez*, 19 Cr. 691 (S.D.N.Y. May 5, 2021) (McMahon, J.) (sentencing a narcotics conspiracy defendant to time served instead of the recommended 46 to 57 months because the defendant had already spent 18 months incarcerated at the MDC under "terrible" conditions during the pandemic); *United States v. Garcia*, 19 Cr. 593 (S.D.N.Y. Dec. 3, 2020) (Crotty, J.) (imposing 48-month sentence where bottom of guidelines range was 110 months); *United States v. Sealed (Deovaldo Gutierrez Alfaro)* 16 Cr. 241 (24) (CBA) (EDNY), (sentence 10 months below guideline range appropriate based on conditions of confinement. *United States v. Colon*, 15 Cr. 317 (E.D.N.Y. Nov. 20, 2020) (Brodie, J.) (imposing 18 months, consecutive to defendant's 18-month state sentence, where bottom of guidelines was 100 months); *United States v. Rodriguez*, 19 Cr. 817 (S.D.N.Y. Oct. 6, 2020) (Kaplan, J.) (sentencing a narcotics conspiracy defendant with three prior drug felonies to time served because of the "very unusual and very harsh" conditions at the MDC during the pandemic); *United States v. Espinal,* 19 Cr. 622 (S.D.N.Y. Aug. 6, 2020) (Cote, J.) (imposing a downward variance "principally because of the conditions of confinement [at the MDC] that the defendant ha[d] [and would continue to] suffer due to the COVID-19 pandemic"); United States v. Aracena de Jesus, 20 Cr. 19 (S.D.N.Y. July 1, 2020) (Engelmayer, J.) (imposing a substantial downward variance in part because of "the hard nature of the time [the defendant] has served in the MCC during the coronavirus pandemic"); *United States v. Carillo-Berber*, 18 Cr. 703 (S.D.N.Y. June 11, 2020) (Crotty, J.) (sentencing a narcotics conspiracy defendant to time served instead of the recommended 46-57 months due to conditions at the MDC during COVID-19); *United States v.*

*Morgan*, 19 Cr. 209 (S.D.N.Y. May 5, 2020) (Berman, J.) (imposing a downward variance after considering "the conditions of the MDC . . . particularly during this difficult coronavirus time, but also across the board even before the coronavirus erupted").

## Conclusion

For the reasons outlined in this letter, it is respectfully submitted that analysis and application of the sentencing factors enumerated in 18 U.S.C. §3553(a) establish that a sentence of 60 months "sufficient but not greater than necessary" to achieve the goals of sentencing listed in 18 U.S.C. §3553(a)(2).

Accordingly, for all the reasons set forth above, either independently or in combination, and with the supporting documents and materials, the defendant joins in the government's recommendation of a sentence of 60 months in custody to be followed by a term of supervised release of three years.

Thank you for your consideration in this matter.

Respectfully submitted,

*/s/*
Steve Zissou

cc: Andrew.Wenzel@usdoj.gov

*United States v. Elijah Song*
Criminal Docket No. 21-89 (SJ)
Exhibits

Plea Agreement
Character Letters
Educational Document
Family Photos

MRM:APW
F. # 2020R00673

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

          – against –

ELIJAH SONG

                Defendant.

– – – – – – – – – – – – – – – – – X

<u>PLEA AGREEMENT</u>

21-CR-089 (SJ)

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and ELIJAH SONG (the "defendant") agree to the following:

1.     The defendant will plead guilty to Count Five of the above-captioned indictment (the "Indictment"), charging a violation of Title 18, United States Code Section 844(f)(1)(Arson). The count carries the following statutory penalties:

    a.     Maximum term of imprisonment: 20 years
            (18 U.S.C. § 844(f)).

    b.     Minimum term of imprisonment: 5 years
            (18 U.S.C. § 844(f)).

    c.     Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision
            (18 U.S.C. § 3583(b) & (e)).

d. Maximum fine: Greater of $250,000, or twice the gross gain or twice the gross loss
(18 U.S.C. § 3571(b)(2), (b)(3) and (d)).

e. Restitution: Mandatory in the full amount of the losses as determined by the Court. The defendant agrees that the total amount of restitution will be an amount not less than $137,000 (18 U.S.C. §§ 3663A and 3664).

f. $100 special assessment
(18 U.S.C. § 3013).

g. Criminal forfeiture as set forth below in paragraphs 6 through 12
(18 U.S.C. §§ 844(c)(1) and 982(a)(2)); 21 U.S.C. § 853(p))

2. The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). The Office estimates the likely adjusted offense level under the Guidelines to be 20, which is predicated on the following Guidelines calculation:

Base Offense Level (§ 2K1.4(a)(2))                                          20

Total:                                                            <u>20</u>

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 18 and a range of imprisonment of 27 - 33 months, assuming that the defendant falls within Criminal History Category I. Furthermore, if the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before October 1, 2021, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 17. This level carries a range of imprisonment of 24 – 30 months, assuming that the defendant falls within Criminal History Category I. However, because the statutory minimum penalty is 60 months, the effective range of imprisonment will be 60 months. The defendant stipulates to the above Guidelines calculation. The defendant further stipulates that he knowingly and intentionally committed the arsons charged in Counts One, Two, Three and Four of the Indictment. The defendant stipulates that the restitution amount will be not less than $137,000.

       3.     The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

3

4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 60 months or below. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement or (c) the defendant's plea is later withdrawn. The defendant further waives the right to raise on appeal or on collateral review any argument that (1) the statute to which the defendant is pleading guilty is unconstitutional and (2) the admitted conduct does not fall within the scope of the statute. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

5. The Office agrees that:

    a. no further criminal charges will be brought against the defendant for using fire to damage property between March 14, 2020 and July 18, 2020 – including fires on March 14, March 15, March 17, June 14, two on June 21, two on June 22, June 26, five on July 17, and three on July 18 - it being understood that this agreement does not bar the use of such conduct as a predicate act

4

or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq.;

and, based upon information now known to the Office, it will

b. take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

c. make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 5(b) and 5(c). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) moving for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above; and (b) the provisions of paragraphs 5(a)-(c).

6. The defendant acknowledges that he obtained and/or acquired property that is subject to forfeiture as a result of his violation of 18 U.S.C. § 844(f), as alleged in the above-captioned indictment. The defendant consents to the forfeiture of all right, title and interest in the following assets:

(i) Two (2) bottles of ignitable liquids consistent with gasoline, seized from the defendant on or about July 28, 2020, in Queens, New York;

(ii) Four (4) gas cans containing approximately 8 gallons of gasoline, seized from the defendant on or about July 28, 2020, in Queens, New York;

(iii)    Three (3) hand tools including bolt cutters, sledgehammer, and a 8inch hunting knife, seized from the defendant on or about July 28, 2020, in Queens, New York;

(iv)    One (1) AR 15 carbine buffer kit; buffer tube, carbine buffer, carbine buffer spring, castle nut, and endplate, seized from the defendant on or about August 3, 2020, in Queens, New York;

(v)    One (1) AR 15-gun parts: adjustable steel gas block, AR barrel labeled "556 Nato 1:7", "BCM gunfighter" charging handle, upper receiver, seized from the defendant on or about August 3, 2020, in Queens, New York;

(vi)    One (1) AR 15-gun parts packaged: AR 15 lower parts kit, base lower parts kit, AR upper parts kit, fire control group kit, black gun grip, cleaning rod, seized from the defendant on or about August 3, 2020, in Queens, New York;

(vii)    One (1) 5.56x M855 Steel Core Ammo by Lake City, seized from the defendant on or about August 3, 2020, in Queens, New York;

(viii)    One (1) "Improvised Explosives: How To Make Your Own" Book, seized from the defendant on or about August 3, 2020, in Queens, New York;

(ix)    One (1) "U.S Army Explosives And Demolitions Handbook, seized from the defendant on or about August 3, 2020, in Queens, New York "

(x)    One (1) Lexar 16GB thumb drive, seized from the defendant on or about August 3, 2020, in Queens, New York;

(xi)    One (1) Gray/green ammunition box, seized from the defendant on or about August 5, 2020, in Queens, New York; and

(xii)    Forty (40) 9mm Luger Federal Cartridge ammunition, seized from the defendant on or about August 5, 2020, in Queens, New York; (collectively, the "Seized Property").

The defendant agrees that the Seized Property represents (a) any explosive materials

involved or used or intended to be used in any violation of Title 18, United States Code,

Section 844; (b) any property constituting, or derived from, proceeds obtained directly or indirectly as a result of the defendant's violation of 18 U.S.C. § 844(f) and/or (c) substitute assets, and thus are forfeitable to the United States pursuant to 18 U.S.C. §§ 844(c)(1) and 982(a)(2); and 21 U.S.C. § 853(p), in an administrative or judicial (civil or criminal) proceeding at the Office's election. The defendant consents to the entry of a Preliminary Order of Forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, forfeiting the Seized Property.

7.    If the defendant fails to surrender and forfeit the Seized Property, the defendant consents to the forfeiture of any other property of his up to the amount of the value of the Seized Property, pursuant to 21 U.S.C. § 853(p), and further agrees that the conditions of 21 U.S.C. § 853(p)(1)(A)-(E) have been met.

8.    The defendant agrees to fully assist the government in effectuating the surrender and forfeiture of the Seized Property to the United States, and to take whatever steps are necessary to ensure that clear title passes to the United States, including the execution of any documents necessary to effectuate the surrender and transfer of title to the United States. The defendant agrees not to file a claim or petition seeking remission or contesting the forfeiture of the Seized Property in any administrative or judicial (civil or criminal) proceeding. The defendant further agrees not to assist any person or entity in the filing of any claim or petition seeking remission or contesting the forfeiture of the Seized Property in any administrative or judicial (civil or criminal) forfeiture proceeding. Further, if any third party files a claim to the Seized Property, the defendant will assist the government in defending such claim.

9.    The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any document to accomplish the same on timely notice to do so, may constitute a material breach of this agreement. Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant.

10.    The defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of any monies and/or properties forfeited hereunder, including notice set forth in an indictment, information or administrative notice. In addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on the forfeiture of the Seized Property, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the Constitution, any applicable statute of limitations, venue, or any defense under the Eighth Amendment, including a claim of excessive fines.

11.    The defendant agrees that the forfeiture of the Seized Property is not to be considered a payment of a fine, penalty, restitution loss amount, or any income taxes that may be due, and shall survive bankruptcy.

12.    The defendant agrees to unconditionally release and hold harmless the United States and Bureau of Alcohol, Tobacco, Firearms and Explosives, its officers, employees, and agents, from any and all claims, demands, damages, causes of action or suits, of whatever kind that might now exist or hereafter exist relating to the seizure, restraint, and/or forfeiture of the Seized Property.

13. This agreement does not bind any federal, state or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

14. Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement

supersedes all prior promises, agreements or conditions between the parties. To become

effective, this agreement must be signed by all signatories listed below.

Dated: Brooklyn, New York

_____, 2021

JACQUELYN M. KASULIS

Acting United States Attorney
Eastern District of New York

By: *Andrew P. Wenzel*
_____
Andrew P. Wenzel
Assistant United States Attorney

Approved by:
_____
Michael R. Maffei
Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney. I understand all of its
terms and am entering into it knowingly and voluntarily.

_____
ELIJAH SONG
Defendant

Approved by:
_____
Steven Zissou, Esq.
Counsel to Defendant

10

Elizabeth Whang

41-33 75th Street

Elmhurst, NY 11373

July 14, 2021

Dear Honorable Judge Johnson,

    My name is Elizabeth Whang and I am Elijah Song's fiancé. I writing on his behalf to ask for leniency on his trial. Like Elijah, I was born and raised here in Queens. I've been a nurse for almost 6 years at NYU Langone in Manhattan. During the height of the pandemic, there was a shortage of ICU nurses. Due to some past experience in the transplant ICU, I was reassigned to the COVID ICU for three months until travel nurses from different parts of our country were able to alleviate the load. I just graduated from a Master's program for my Family Nurse practitioner degree this May 2021. I've been working towards this degree for the past 3 years while working and going to school part time. A big part of how I was able to get through those years is due to Elijah's unconditional support. I hope to become a primary care NP in a doctor's office in the near future.

    I met Elijah back in December 2016 when I was 26 and Elijah was 24 years old at a church in Flushing. Elijah was still in pharmacy school at the time and I thought he was too young for me. But when I met him again when he was 26, I knew I would be a fool to let such a good man go. We've been together ever since. We got engaged February of 2020. He stayed by my side throughout the pandemic while I was isolating myself in a small unit upstairs in my parents' home. I was taking all necessary precautions as I had been reassigned to the COVID ICU and I was afraid that I would accidentally pass the virus to my parents. Things were pretty bad in this part of Queens by Elmhurst Hospital. A lot of people in this community got sick and died and there were hardly any people outside. However, as August rolled around, we began to see some hope as businesses were opening. However, Elijah was arrested on August 3, 2020. I have been waiting for his release since last year. Due to COVID-19 visitor restrictions at MDC, I had to wait until June 24, 2021 to see him for a one hour visit, eleven months after his arrest.

    The reason why I am able to wait for Elijah is because of his outstanding character, loyalty, and the love he has given me. He was always by my side. I have no obligation to stay with him. I have no children with him, I am not married to him, and I do not have any financial issues that would tie me to him.  Throughout our relationship, I was working full time as an RN while also getting my Master's degree at NYU. So I always had somewhere to be. Even though Elijah also had work and was taking care of his widowed mother, he always made it a priority to pick me up or drop me off at work, school, and

clinicals. When I was exhausted after a 12.5 hour night shift or a day of classes, I saw him waiting for me and I felt very cared for.

Another thing I love about Elijah is that he is a very positive person and he is always in good spirits. I don't think I have ever heard him complain or grumble about anything. My dog needed cataract and retinal reattachment surgery. This required many pre and post op visits to a veterinary eye doctor in Long Island. Elijah has taken my dog to these appointments many times when I was busy at work or school and he never complained. If it were not for Elijah's help and emotional support, I probably would not have been able to get through graduate school.

Another thing I love about Elijah is his resilience. He studied his entire life toward his 6 year doctoral degree in pharmacy. Elijah's father passed away when he was 2 years old so he did not have the same capital or support that most children have growing up. And yet, Elijah made the most out of his life. His mother and younger brother have relied on him since he was a young man. And despite the trials in his life, I am amazed at how much he loves life. Other things I find attractive about Elijah: his commitment to eating healthy, exercising, and just becoming a better person every day.

Your Honor, please do recall what healthcare workers had to endure in 2020. While most people were able to work remotely from home, healthcare workers were in the front lines reusing PPE without hazard pay or unemployment benefits. Please remember the trauma and stress that healthcare workers had to go through during the pandemic before vaccines were available. Many healthcare workers, including Elijah had to live in isolation. This led to the unraveling of the mental health of many in the medical field. Please take into consideration the difficult conditions at MDC Brooklyn and the lockdowns that kept inmates in their cells for almost 23 hours a day for days and sometimes even weeks. Please see the ways that Elijah has been working hard at the kitchen unit in MDC Brooklyn. And finally, please remember the way he has contributed to the diverse Queens community as a pharmacist and taxpaying citizen.

Now that I have seen what Elijah needs, I commit to being less self-absorbed with my career and being more attentive of Elijah. I will prioritize getting him whatever counseling, extracurricular activities, and exercise he needs to stay focused on the good things in life. I pray every day for his release. I hope to get married to him and to start our new lives together.

Sincerely,

Elizabeth Whang

Dear Judge,

My name is Justin Yi writing in regards to Elijah Song. Some background on myself is that I am a Registered Nurse at Elmhurst hospital and an Air Force Veteran. I've come to know Elijah from a young age when we attended church together. We were both in elementary school when we became friends and that friendship continued until now. A little about Elijah's character is that he was always known to be respectful, thoughtful, honest, and someone you can trust. Growing up I would sometimes not have enough money to buy food and I remember Elijah always sharing or even buying me meals. Another fun memory is our first sleepover where he would give up his bed and sleep on the floor so I wouldn't have too. In high school he was a great student and made a goal to become a pharmacist in order to help those around him. When he eventually graduated from St. Johns and became a pharmacist he continued to help me and my wife. During the start of the pandemic my wife got extremely ill and Elijah would come deliver her medications to my house when I couldn't pick them up. He has always been selfless. Another example is when I first bought my car and knew nothing about what to look out for. Elijah came with me and told me what to look out for, even taking me to the DMV and helping me with the buying process. These are just a few examples of the kind of person he is. I don't know what the future holds for Elijah, but I write this letter to shed some light into the Elijah that I know. Him being incarcerated is a disservice to society because of the good I know he offers and a waste of an outstanding citizen. I know given a second chance he can make this world a better place. Thank you for your time.

Sincerely,

Justin Yi

Jen Whang
415 White Oak Road
Palisades, NY 10964


May 19, 2021


Re: Elijah Song

To The Honorable Judge Johnson,

I am writing this letter and requesting an audience with you to provide a character reference on Mr. Elijah Song, who I have the privilege to know as a friend and younger brother in church for over ten years, of which he has proven to be of a fine and upstanding character. I write this reference with full knowledge of Mr. Song's charges and urge leniency in the sentencing of my friend. I thank you in advance for this opportunity to paint a picture of the friend I know and I am indebted for your kind attention.

To begin briefly, the nature of my relationship with Elijah Song is from church. We both attend the Korean-American Presbyterian Church of Queens, NY. I have been attending this church for the past forty-five years and I also serve as a deacon since 2006. I am also a NYS teacher with over sixteen years experience currently teaching at a middle school in a Rockland Country school district.

I know his family and served with his mother at various church functions and missions and met Elijah when he began attending the English Ministry (QPEM) as a college student over ten years ago. He was quiet, reserved, and respectful back then and still is. He served as a Sunday School teacher for the preschool and high school levels, volunteered for church bazaars, and local outreach missions to connect with patients and residents at the Franklin Nursing Home and seniors at the Sanford Home both in Flushing, Queens.

Our friendship deepened when Elijah signed up for our church's 57th Fall Semester Evangelism Training Class in 2018. I was the lead trainer for the class and I was immediately moved by his commitment, passion, and heart to share his testimony and love for Jesus with others, especially his close friends. I was also impressed by his knowledge and understanding of the Bible and theology. During this semester, I had the privilege of getting to know him better and training him to share his faith with others. Despite his busy work schedule as a pharmacist, his commitment to the weekly classes left an indelible mark in me as someone who is trustworthy and reliable.

Elijah Song never disclosed in full detail but on a personal level, I do know from impromptu conversations we shared that he had to overcome academic and cultural challenges to successfully graduate from St. John's Pharm-D program, especially without the presence or guidance of a male parental figure in his house. Culturally, as a Korean firstborn son and elder brother, much onus is laid on them, but Elijah Song proved his ability, tenacity, and perseverance by completing this formidable and honorable program and graduating.

It is difficult for me to comprehend what led to this crime but I know last year was deeply and especially challenging for many people. My sincerest wish is that this letter presents a different and positive light to who Elijah Song really is and that he is more than the sum of his action. It is also my humble request that this letter will serve as a beneficial and contributing factor when the court considers this matter.

Thank you again for your kind attention and thoughtful consideration.


Respectfully,

Jen Whang

Your honor,

My Name is John Song and I am a United States Navy Hospital Corpsman Second Class. I am writing on the behalf of my brother, Elijah Song.

I would like to say that I have thus far served my country with honor, courage and an unwavering commitment in the defense of this Great Nation. As a member of the Hospital Corps, I am charged with safeguarding our most valuable assets, the health of my fellow Sailors and Marines. For over half a decade, I have seen and assisted numerous Medical Officers in rendering care to over 3,000 Service Members across 3 countries. I have had the privilege to give aid to patients with various symptoms ranging from 1st degree Frost Bite to Life threating Cardiac Arrhythmias. The reason why I bring this up is not to showboat my merits but rather to illuminate the person who indirectly impacted thousands of lives.

My brother, Elijah, is someone who always challenged me to become better. He is the person who first put the seed of becoming a medical professional in my mind and truly motivated me to become a stronger Corpsman. Throughout the early stages of my career, Elijah would always display the immense pride he had in my service and was even my mentor when it came to pharmacology as well as patient care. I can recall many moments where we shared conversations about my future aspirations of become a Physician despite my previous shortcomings during my earlier stint in Queens College. It was those conversations that helped that kindle that fire into passion and without Elijah, I would not be where I am today. If it wasn't for my brother, I would have never enlisted in the most decorated rate in the Navy. I would be honored if I can return the favor and now look after my brother.


Very Respectfully,

HM2 (FMF) Song, John

--------------------------------------------------------------------------------

FROM: 01248509
TO:
SUBJECT: Letter to Judge
DATE: 05/06/2021 06:08:28 PM

To your Honor,

My name is Kayshawn Robinson. I have been incarcerated in MDC for over a year. I have experienced so much within this time. When I first appeared into prison my head was off my shoulders. I didn't have any guidance as a young man. I took one day at a time. While I was sitting here in a struggle and needed help nobody really cared.

One day I was having trouble typing a letter, Elijah, was right there to ask and help me. When he said it, he was nervous but real humble and respectful. I was so arrogant and told him no. When in reality I did need the help. Weeks went by and we spoke. He ended up being the person who taught me how to type and get my skills where they are today. I am happy to say everything he has taught and shown was genuine. I also see that he didn't judge me nor did he discriminate. I appreciate that about him. I did not come into prison with the intention to have friends, but someone who is there to help with a good personality that would like to see you do good in life, is good company to keep. Elijah has also helped me write a letter to my judge and how it should be. My grammar and spelling has gotten better from what he was taught. I would like to say that he is not a bad person and I see the good in his heart as well as him doing better in the community.

One day I seen Elijah get into an altercation with someone, but the way he handled it was so respectful, calm patient and good energy. In the situation he was in, anybody else would had fought and took things to another level. From that day it taught me how to humble myself and accomplish my goals. I did not know as much knowledge or computer skills. But getting the help from Elijah and watching his steps has shown me how to type and fix my grammar errors. I just hope he can get leniency at sentencing from the heart and know he is not a bad person.

Respectfully,
Kayshawn Robinson

U.S. DEPARTMENT OF JUSTICE          FEDERAL BUREAU OF PRISONS

| Inmate's Name: SONG, ELIJAH | Register No: 92417-053 | Unit: KC |
|---|---|---|
| Evaluation Period:<br>November 26TH - December 25TH 2021 | Work Assignment: FOOD SERVICE 2- Cook Shift | |

Inmate Song has been working in the kitchen for the past seven months. During this period, he has proven to be responsible, reliable and very hard working. He takes initiative and responds well to constructive criticism. He is always willing to learn and has become one of the go to inmates in the kitchen because he pretty much helps any detail in need. Inmate Song gets along and works great with other inmate and staff.

Signature and Date of Dept. Head Approval



Route to Dept. Head for Review, Then to Unit Team

Instructions: Check the best statement in each area.  Base your rating on the inmate's overall performance for the rating period--neither the inmate's best day nor worst day--as compared to what is expected of a satisfactory worker in the assignment.

**A. QUALITY OF WORK**
___l. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
___2. Fair. Careless; makes mistakes and does not check work. Should do better work.
___3. Satisfactory. Makes some mistakes but no more than expected at this level.
___4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work
_X_5. Outstanding. Does superior work

**B. QUANTITY OF WORK**
___1. Unsatisfactory. Lazy, wastes time, goofs off.
___2. Fair. Does just enough to get by. Has to be prodded occasionally.
___3. Satisfactory. Works steadily but does not push self.
___4. Good. Willing Worker. Does a full day's work and wastes little time.
_X_5. Outstanding. Drives self exceptionally hard all the time.

**C. INITIATIVE**
___l. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
___2. Fair. Usually relies on others to say what needs to be done.
___3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
___4. Good. Can plan own work well. Acts on own in most things.   Doesn't wait to be told what to do.
_X_5. Outstanding. Has good ideas on better ways of doing things.

**D. INTEREST; EAGERNESS TO LEARN**
___l. Poor. Shows no interest in job. Regards job as a drag or waste of time.
___2. Fair. Shows minimal interest but not very eager to learn.
___3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
___4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
_X_5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things that will improve knowledge.

**E. ABILITY TO LEARN**
___1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction unable to learn, No matter how hard trying.
___2. Fair. Slow but if tries eventually will pick up the skills. Needs more instructions than most.

___3. Average. No slower and no faster to learn than most inmates.   Requires average amount of instruction.
___4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
_X_5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

## F. NEED FOR SUPERVISION; DEPENDABILITY; SAFETY; CARE OF EQUIPMENT
___l. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
___2. Needs closer supervision than most. Not very dependable.
___3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
_X_4. Needs little supervision. Good record of dependability an promptness.
___5. No supervision required. Completely dependable in all things.

## G. RESPONSE TO SUPERVISION AND INSTRUCTION
___l. Poor. Resentful and hostile. May argue with supervisor.
___2. Fair. Resists or ignores suggestions.
___3. Satisfactory. Generally does what is told without any fuss.
_X_4. Good. No hostility or resentment. Tries to improve.
___5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

## H. ABILITY TO WORK WITH OTHERS
___l. Poor. Negativistic, hostile, annoying to others.
___2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
___3. Satisfactory. Gets along OK with most co-workers and is accepted by them.
___4. Good. Friendly, congenial, helpful; others like to work with.
_X_5. Outstanding. Gets along well with everyone. Very popular.

## I. OVERALL JOB PROFICIENCY
   Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:
___l. Fire or lay off that individual?
___2. Transfer the person to a less demanding job at a lower pay scale?
_x_3. Continue to employ the person but without a raise or promotion this time?
___4. Raise the person's pay but keep the person at the same job?
___5. Promote the person to a more demanding job at a higher pay rate?

## J. GRADES AND PAY
   1. Performance Pay - Grade Class (Check one)___ 1    ___ 2    ___ 3  _X_4    ___ M.

   2. Hours of Satisfactory work _____

   3. Regular Pay _____

   4. Bonus Recommended: _____ yes_____ no

   5. Total Pay_____

| Supervisor's Signature<br>   S. NYANOR    *Nyan* | Date<br>   DECEMBER 25th, 2021 |
|---|---|
| Inmate's Signature<br>**X**    *(signature)* | Date<br>   DECEMBER 25th, 2021 |

Inmate _____ was requested to sign this rating, but refused, citing the following reason:

| Staff Witness' Signature | Date |
|---|---|

Neva Carina
41-45 149th Street
Flushing, NY 11355

April 21, 2021

Your Honor Judge Johnson,

I am writing this letter to request leniency for my friend and brother in Christ, Elijah Song.

I have known Elijah only for two years before he was arrested, but to me it feels like we have known each other for forever. I first met Elijah as a newcomer in a church that he had grown up in. He was one of the few people that came up to greet me; I will never forget his shy, welcoming smile and his kindness to me that day.

Very soon, I learned about Elijah's past, how he grew up without a father, and yet he turned out to be an accomplished pharmacist and a loving son that has always been there for his mother and little brother, John. Elijah was always there for me too. I remember how he was the only person willing to drive into Midtown NYC on a weekday evening during heavy rain, to help me pick up toy donations from my office for Garden of Hope, an organization that supports single mothers and children with a history of domestic violence. Elijah had been opening up his house for our group of friends to hang out and to hold weekly bible study every Saturday until the time the pandemic hit the country.

To be completely honest, Your Honor, it is a gross understatement that I was shocked to hear the crime that Elijah was convicted of. I've always seen Elijah as a God-fearing man, humble about his faith and generous with his time and resources. He treats me not as his mere friend, but truly as his little sister. If Your Honor knows him as I do, Your Honor would know that Elijah would never hurt anyone nor turn anyone away. Our church members are praying for Elijah every time we gather, and we are all waiting for his return.

I sincerely hope that Your Honor would consider sentencing Elijah time served. Thank you from the bottom of my heart.


Yours Truly,

Neva Carina

Neva Carina
Strategic Sourcing Manager

Symong Choi
28-16 210th Place
Bayside, NY 11360


July 30, 2021


Re: Elijah Song

To The Honorable Judge,

My name is Symong Choi. I have been a NYS licensed physical therapist for the past 10 years and am currently the physical therapy supervisor at a school for children with disabilities in Long Island. I am also a father of three young children.

I am writing this letter to provide a character reference for Elijah Song.  I have known Elijah for more than a decade through our church, Korean American Presbyterian Church of Queens, which I have attended for the past 45 years and where I have been an Elder since 2018. I also had the privilege of being Elijah's Bible study leader during his college years.

I first got to know Elijah when I started giving him rides to church on Sundays.  While he was in high school, Elijah's mother had become worried about his faith and asked if I could encourage him to attend church more regularly.  I also left the church for a while at that age, and it wasn't until someone took the time to mentor me and teach me the importance of being a part of a Christian community that I grew in my faith.  In this spirit, I agreed to reach out to Elijah and offer him a ride to church.

At first, our car pooling was inconsistent at best.  However, over time, Elijah attended more consistently and got plugged into the church community, which allowed him to hear God's words and forge positive and nurturing relationships.  Gradually, I witnessed Elijah serving in the church, welcoming newcomers, offering rides and meals to those in need, and vulnerably sharing his testimony and experiences with others.  I no longer had to pick up Elijah for church -- he was already there, not only on Sundays but often on weeknights and Saturdays as well.

Unfortunately, over time and with changing life stages, Elijah and I didn't have as much time to catch up, which I now regret.  Not to blame shift or provide excuses, but I do believe this past year and a half has brought numerous challenges to individuals on so

many different fronts -- socially, emotionally, physically, spiritually and mentally.  My experience working with children with disabilities has taught me that anyone can learn, but not everyone learns at the same rate, but having a supportive environment is key.

I believe that when we are sincerely repentant, God forgives us of our sins; however, this does not abolish the consequences that may result from our sins.  I also believe God is sovereign and that everything is according to His will, and though sometimes we may not understand His purpose, more often He is teaching us through challenges and hardships.  If we are never wronged, how will we ever learn to forgive?  If we don't experience regret and repentance, how can we truly appreciate the amazing gift of forgiveness?

I pray that this letter may shine a light on the Elijah Song that I know instead of the man you only know from a police report.  We are all sinners in need of grace.

Thank you again for your kind attention and thoughtful consideration.

Respectfully,


Symong Choi

The University of the State of New York
Education Department
Office of the Professions

# REGISTRATION CERTIFICATE

*Do not accept a copy of this certificate*

License Number:   I063215-01                    Certificate Number: 1116615

SONG ELIJAH
FL 1
14736 CHERRY AVE
FLUSHING                        NY    11355-0000

is registered to practice in New York State through 05/31/2023 as a(n)
**PHARMACIST**

LICENSEE/REGISTRANT

*Dena Jyn*

EXECUTIVE SECRETARY

*Sharon L. Tahoe*
INTERIM COMMISSIONER OF EDUCATION

*Sarah L. Benson*
DEPUTY COMMISSIONER
FOR THE PROFESSIONS

*This document is valid only if it has not expired, name and address are correct, it has not been tampered with and is an original - not a copy. To verify that this registration certificate is valid or for more information please visit*
**www.op.nysed.gov.**

# Universitas Sti. Joannis Neo-Eboraci

Curatores Universitatis Sti. Joannis Neo-Eboraci

**Facultate Pharmacopoediae et Sociarum Salutis Occupationum Commendar**

Testamur nos ad

**Pharmacopoediae Doctoratum**

**Elijah Song**

provexisse

quum omnia ad illum gradum pertinentia, quae per statuta requirantur,
praestiterit et compleverit. In quorum Fidem hae dantur litterae sigillo
Universitatis et Praesidis ac Scribae necnon Decani chirographis munitae.
Datum Ex Aedibus Universitatis Sti. Joannis Neo-Eboraci
die XV       mensis       MAII       Anno Domini MMXVII



*Teresa Mason*
**Scriba**

*Russell A. DiStata*


**Praeses**

# The National Society of High School Scholars

To whom these letters may come

## Greetings

This certifies that

## ELIJAH SONG

in recognition of academic achievement and excellence, has been granted
membership in The National Society of High School Scholars and is hereby
awarded all rights, honors, and privileges thereunto appertaining.
This membership is for meritorious scholastic achievement
and the pursuit of excellence at

## BAYSIDE HIGH SCHOOL



*Claes Nobel*

_Founder & Chairman_
_The National Society of High School Scholars_

*James W. Lewis*

_President_
_The National Society of High School Scholars_

2008





